Shades Ridge Holding Company, Inc., Transferee, et al. [1] v. Commissioner. Shades Ridge Holding Co. v. Commissioner
Docket Nos. 84652, 84653, 94991, 4219-62.
United States Tax Court
T.C. Memo 1964-275; 1964 Tax Ct. Memo LEXIS 62; 23 T.C.M. (CCH) 1665; T.C.M. (RIA) 64275; October 21, 1964
*62 1. Petitioners' taxable income from lottery operations during the years 1956, 1957, and 1958 redetermined. 2. At least a part of the deficiency in petitioners' income tax for each of the years 1956, 1957, and 1958 was due to fraud with intent to evade tax. Fifty percent addition to tax for fraud imposed. Winston B. McCall, for the petitioners. George W. Calvert, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: In these consolidated proceedings, respondent determined the following deficiencies in income tax and additions thereto under section *63 6653(b) [2] due from petitioners Sam and Katherine Fiorella: Dkt.
Taxable
Income
Section 6653(b)
No.
Year
Tax
Addition to Tax
84653
1956
$286,693.04
$143,346.52
94991
1957
298,258.48
149,129.24
1958
131,016.26
65,508.13
Respondent also determined that petitioner Shades Ridge Holding Company, Inc., is liable as transferee for a part of the deficiencies in income tax and additions thereto due from petitioners Sam and Katherine Fiorella as follows: Taxable
Transferee
Dkt. No.
Years
Liability
84652
1956
[1] $105,480.68 4219-62
1957-1958
[1] 105,480.68 Respondent has conceded on brief that Shades Ridge Holding Company, Inc., is not liable as a transferee. Accordingly, decision will be entered for petitioner in docket Nos. 84652 and 4219-62, and hereafter Sam and Katherine Fiorella will be referred to as petitioners. The issues remaining for decision are: (1) Whether petitioner Sam Fiorella realized taxable income from lottery operations in the taxable years 1956, 1957, and 1958 *64 in addition to amounts reported by him for these years as income from wagering, and if so, the amounts thereof; and (2) Whether petitioners Sam and Katherine Fiorella are liable for the addition to tax for fraud for each of the years 1956, 1957, and 1958. Findings of Fact Petitioners Sam and Katherine Fiorella (hereafter referred to respectively as Sam and Katherine) are husband and wife who resided in Birmingham, Alabama, during the years 1956, 1957, and 1958. They filed joint Federal income tax returns for the taxable years 1956, 1957, and 1958, with the district director of internal revenue, Birmingham, Ala. In their return for 1956, petitioners reported net income from rentals in the amount of $3,114.98, computed after allowance for depreciation with respect to three buildings, the date of purchase and the costs of which were reported. Petitioners also reported a capital loss from the sale of one of the buildings [3] in 1956. Petitioners reported the amount of $2,000 as a loss from a joint venture in drilling an oil well, and, as income from "Other sources," they reported the amount of $41,500 with the explanation, "Wagering." They attached a Schedule C, "Profit (or Loss) *65 From Business or Profession," to their return, with Sam's name typewritten on the schedule; otherwise the schedule was not completed. They reported the amount of $41,500 as net profits from business for purposes of computing self-employment tax. In their return for 1957, petitioners reported the amount of $2,932.42 as net income from rentals from two buildings for the period January 1 to May 27, 1957, when, it was reported, the buildings were sold. However, no details of the sales were given and no gain or loss reported. Petitioners attached a Schedule C to their 1957 return with Sam's name at the top and showing the amount of $19,800 as net profit with the explanation, "Wagering." Nothing else appeared on the schedule. This amount of $19,800 was shown as net profit from business for purposes of computing the self-employment tax. In their return for 1958, petitioners *66 reported the amount of $21,000 as income from "Other sources," with the explanation, "Wagering." No details were given. They also reported the amount of $16,528 as income from a partnership described as "Joe Agnesia & Sam Fiorella, Birmingham, Alabama." The amount of $21,000 was reported as net income from business for purposes of computing the self-employment tax. A Federal partnership information return for the taxable year 1958 [4] was filed with the district director of internal revenue, Birmingham, Ala., for a partnership comprised of Joe Agnesia and Sam, with its address at 2805 15th Avenue North, Birmingham, Ala. It was reported in that return that the partnership commenced business on August 1, 1958; that its principal business activity was "Amusement"; that gross income for 1958 amounted to $34,374.92; that operating expenses totaled $13,714.92; and that, of the resulting net income in the amount of $20,660, the amount of $16,528, or 80 percent, was distributable to Sam, who devoted 100 percent of his time to the business. No balance sheets or details of the partners' capital accounts or information regarding partnership assets, if any, were shown on the return. *67 The Fiorella-Agnesia partnership return for 1958 and petitioners' income tax returns for 1956, 1957, and 1958, were prepared by a certified public accountant in Birmingham, who had prepared petitioners' income tax return for 1955. In preparing petitioners' return for 1955, the accountant discussed with Sam the necessity of Sam's maintaining records for his wagering income. The accountant told Sam that he should keep "memorandum records of such income." [5] In preparing petitioners' returns for 1956, 1957, and 1958, the accountants obtained the information for the returns from Sam, and he examined canceled checks, check stubs, rental statements from a rental firm, and real estate sales memoranda. For each year, Sam gave the accountant the lumpsum figures mentioned above as his income from wagering. Sam, in giving this information, referred to a memorandum or note which he kept in his possession and which the accountant did not examine. Sam gave the accountant did not examine. Sam gave the accountant no information regarding the sources or details of the wagering income, or how it was computed, and the accountant, who assumed the wagering income was from several sources, sought no details. *68 The canceled checks and check stubs which the accountant examined did not pertain to Sam's business. However, for each year the accountant discussed with Sam petitioners' expenditures and acquisitions during the year and satisfied himself that information as to petitioners' income, as given by Sam, was consistent with the information regarding petitioners' expenditures and increases in net worth. The accountant made no independent investigation of petitioners' expenditures or net worth increases and relied on information given him by Sam without verification. In preparing the partnership return for the Fiorella-Agnesia partnership for 1958, the accountant examined records maintained for the business. During the years 1956, 1957, and 1958, a checking account was maintained in Katherine's name at Exchange Security Bank, Birmingham, Ala. Katherine paid household expenses by check drawn on the account. The highest yearly month-end balances of the account for the period 1956-58 were $1,654.22 at September 30, 1956; $2,133.40 at *69 April 30, 1957; and $530.49 at August 31, 1958. Deposits to the account of $500 or more during the 3-year period were as follows: Date
Amount
Jan. 18, 1956
[1] $25,000.00 May 7, 1956
500.00
Sept. 11, 1956
1,378.63
Oct. 8, 1956
763.32
Nov. 6, 1956
718.11
Dec. 15, 1956
681.99
Jan. 7, 1957
[2] 10,000.00 Feb. 2, 1957
[3] 11,000.00 Feb. 6, 1957
730.36
Mar. 6, 1957
792.51
Apr. 16, 1957
745.87
May 7, 1957
520.00
July 6, 1957
960.00
Sept. 4, 1957
500.00
Oct. 8, 1957
725.00
Mar. 4, 1958
700.00
Apr. 15, 1958
[4] 5,000.00 July 8, 1958
650.00
Aug. 25, 1958
500.00
Oct. 6, 1958
500.00
Dec. 4, 1958
[5] 500.00 During the years 1948, 1949, and 1950, Sam had an interest in a lottery known as the "Joe Louis" policy. Sam had an interest in lotteries known as the *70 "Boy and Girl" and the "King and Queen," which were in operation in the Birmingham area for periods during 1956, 1957, and 1958. A lottery, also known as a policy or a numbers game, was customarily conducted in the Birmingham area by an operator, or operators, working at a central location, or counting house. The operator (or operators) had several employees at the central location. Wagers were accepted from individual bettors throughout the Birmingham area by writers who worked out of station houses, or locations which were generally known to bettors. To record wagers, a writer used a pad containing 100 sheets of white paper, 2 by 4 inches. The writer would write the amount bet and the numbers chosen by the bettor on a sheet of the pad, or "bet slip." By use of a double-faced piece of carbon paper, a carbon copy of the "bet slip" was prepared simultaneously for the bettor for him to keep as his record, and the information written on the face of the "bet slip" would be duplicated by carbon copy on the reverse side of the "bet slip" in order to prevent alteration of the numbers bet after winning numbers were determined. The original of the "bet slip," with information penciled on *71 one side and the same information carbon copied on the reverse side was retained by the writer. These original "bet slips" were placed by the writer in an envelope with the money bet. Writers' envelopes were delivered through the station managers to the operator (or operators) at the counting house where employees checked the contents to see that the money in each envelope tallied with the total wagers shown on the "bet slips" in the same envelope. A typical "bet slip" was as follows: 17 X 11) 4 (1 4 - 8 - 26 7 - 14 - 37 23 - 53 - 16 1 - 40 - 16 6 - 60 - 70 5 - 12 - 78 11.50 3-6-9 21.50 route75 The "17 X 11" figures in the upper lefthand corner of the slip identified the station and writer involved in the wager. The "17" was the number of the station; "11" was the number of the writer. Station numbers ranged to at least 67, but this number would not signify that there were 67 stations in operation, since numbers were given to stations arbitrarily. A station may have more than one number. For example, a particular location may serve as the station for one lottery - "King" - and also for a related lottery - "Queen" - and have one number for the "King" lottery, *72 17, and another for the "Queen" lottery, 67, which was exactly 50 more than its lower number for the "King" lottery. [6]
The six series of numbers, of three numbers each, in the center of the sheet represent numbers on which the bettor wagered. The "11.50" indicates the amount, $11.50, which the bettor would win if his three numbers in any one of the six series were drawn in the lottery. The bettor wagered 10 cents on each of these six series. The series "3-6-9" is also a series on which the bettor has wagered. The "21.50" figures indicate that he would win $21.50 if the numbers "3," "6", and "9" were drawn in the lottery. The bettor wagered 15 cents on these three numbers. The bettor's total wagers were 75 cents, as shown in the lower right-hand corner of the slip - 10 cents on each of the six series, plus 15 cents on the series "3-6-9." It is not explained in the record why a win on one of the six series, on which the bettor had bet 10 cents, would *73 return $11.50, while a win on the 3-6-9 series, on which the bettor had bet 15 cents, would return $21.50. A bettor could bet on numbers in numerous ways. Not only could he bet on one or several series of 3 numbers each, as indicated on the above slip, but he could bet on a 2-number series (a win on which paid relatively less than a win on a 3-number series) or on a 4-number series (a win on which paid relatively more than a win on a 3-number series). He could also bet on 4 numbers, any three of which might win a 3-number series, if 3 of the 4 numbers were drawn. [7]
However, no matter how a bettor wagered, the amount which he might win on a particular type of bet was determined in advance by the amount of his wager. The lottery was not a pool or a pari-mutuel operation in which winnings were paid from only the total amount wagered with the operator always retaining a portion of the total. The *74 number in the top center of a "bet slip" - number 4 on the illustrative "bet slip" set out above - indicated the lottery "class," or drawing. A drawing for a lottery was conducted by putting 78 balls, numbered 1 through 78, in a bag, shaking the bag, and pulling out 12 balls which gave the winning numbers. Lotteries were conducted by pairs with related names (each known as a "wheel") which were known to bettors, for example, the "King and Queen," the "Red and Blue," and the "Boy and Girl." There would ordinarily be a morning drawing for "King" and a drawing at the same time for "Queen," and there would also be an afternoon drawing for each lottery, with the number 1 being given to the first drawing for a lottery in a particular week. Thus, if the lottery was conducted on a Monday, the number 1 would ordinarily be given the Monday morning drawing, and the number 4 would represent the Tuesday afternoon drawing, and so on throughout the week. The "class" number also identified the drawing for a related lottery. For example, "class 5" for the "King" lottery might be "class 5B" for the "Queen" lottery. [8]
*75 On the "bet slip" set out above, the number 1 in the upper right-hand corner indicates the bet number which the writer has written in a particular book of slips. A drawing for a lottery might be conducted at a central location where the operator and his employees checked "bet slips," or at a station where bettors could witness it. After the drawing, slips were printed to show the numbers which had been drawn, for distribution to, and for the information of, writers and bettors. On one side of the slip was printed the "class" for "King" lottery; the numbers drawn in the "class"; and the writers "shut out" (that is, writers who had been arrested and whose wagers had not arrived at the central location before the drawing) of the lottery for the particular "class." On the reverse side of the drawing slip was printed similar information for the related lottery ("King-Queen," "Boy-Girl," etc.). An operator employed pickup men to collect the cash wagered. These employees drove cars furnished by the operator and collected writers' envelopes from stations. [9] The writers took out 25 percent of total wagers as their compensation. Operators paid station managers 5 percent of wagers turned *76 in by them. Often writers or pickup men were arrested and cash representing wagers was seized. When a writer's cash collections did not reach the operator for any reason, the operator gave the particular writer's bettors free bets in a subsequent drawing. Sam's lotteries were conducted generally in conformity with customary practices for the conduct of a lottery in the Birmingham area, as described above. Police offiers and investigators familiar with the lottery operations being conducted in Birmingham at a given time, by interrogating writers that were arrested, could often determine which lotteries the bet slips seized in a raid or an arrest were written for and could interpret the bet slips with reasonable accuracy. In November 1956, Sam was operating a lottery in the Birmingham area, probably the "King and Queen"and/or the "Boy and Girl," using as his central location, or head-quarters, a house in the upper Rocky Ridge Road section outside Birmingham. On January 9, 1957, officers from the Sheriff's Office *77 of Jefferson County, Alabama, raided the location, arrested Sam and seven employees, and seized bet slips, other papers, some equipment, and cash in the amount of $1,533.36. [10] The raid was conducted at about noon. The bet slips seized in the raid were turned over to a detective from the Birmingham Police Department who had had extensive experience with lottery operations in the Birmingham area. The detective was familiar with the meaning of numbers, sysbols, and phrases used on bet slips in the area, and it was his job to inventory and list the bet slips. He examined the slips and determined that the seized slips represented writings for the "King" lottery and for the "Queen" lottery for the morning drawing of Wednesday, January 9, 1957, and *78 that a lesser number of slips represented writings for the "King" lottery for the afternoon drawing of the same day. [11] He listed the seized slips by writers' books, and class. For example, he listed items such as "59 plays-book 19X22-c-5-tot.56.70." This item indicated that the arresting officer had seized slips for 59 wagers written by writer No. 22, who worked out of station No. 19; that the wagers were on "class 5," [12] that is, the January 9, morning drawing for "King" lottery; and that total wagers represented by that writer's slips were $56.70. Although the seized slips had been destroyed by order of a local court by the time of the hearing in these proceedings, the detective's list is available and was identified by him. The list indicates that there were 1,306 "class 5" bet tickets seized in the raid of January 9, 1957. These bet tickets apparently represented a total of $1,673.35 wagers on the January 9 morning drawing of the lottery. Sam's arrest on January 9, 1957, resulted *79 in his conviction on May 7, 1957, on a charge of possessing paraphernalia which was customarily or usually used in the operation of a lottery, policy game, or other games of chance. He was fined $500 and was sentenced to 1 year's imprisonment. He remained free on bond pending appeal. On September 22, 1957, the 1-year sentence was changed to probation of 5 years. The probation was revoked on April 16, 1959. On October 1, 1957, Sam, or an employee or associate acting on his behalf, using the fictitious name "W. L. Jones," leased a house in the lower Rocky Ridge Road section outside Birmingham for a term of 1 year, to September 30, 1958. Rental was $100 per month. The house was used as the central location for the operation by Sam of a lottery or lotteries. Operations began on or about October 1, 1957. In early March 1958, a special agent of the Intelligence Division, Internal Revenue Service, began a close surveillance of Sam and of his activities. The special agent's duties entailed generally the investigations of suspected Federal wagering excise tax evasion, but it also involved investigation of attempted wilful evasion of Federal income tax. The special agent was aware of Sam's *80 conviction in 1957, and he was interested in ascertaining whether Sam was operating a lottery and incurring liability for Federal excise tax. He also wanted to discover details of the operation, if Sam was conducting a lottery, and the identities of Sam's employees and associates. He kept Sam's home under observation and identified persons who visited there regularly as persons reputedly engaged in lotteries, and he followed pickup men to and from stations to the central location in the house leased by Sam in the lower Rocky Ridge Road section. This surveillance often was continuous, all day, for 6 days a week. From the time that the special agent began his surveillance of Sam and of Sam's associates he did so with the idea not only of ascertaining Sam's possible liability for Federal excise tax, but also of securing information concerning Sam's net worth, his expenditures and his living habits, with the view to determining Sam's Federal income tax liability, if necessary. The special agent considered that any details which he obtained concerning Sam's activities would serve both purposes, and he continued the surveillance with these ends in mind. Public records in Jefferson County *81 and adjacent counties were checked to determine Sam's property holdings. Local banks were solicited for bank accounts; loan companies and insurance companies were canvassed for any information concerning Sam's transactions. The special agent showed Sam's photograph to employees of banks in the area in order to determine whether Sam maintained or had visited a safe-deposit box, perhaps using a fictitious name. Also, Sam's associates were interviewed in an attempt to find what, if any, expenditures Sam had made in their names. The associates' expenditures, particularly expenditures for automobiles used by pickup men, were checked in an effort to connect them with funds emanating from Sam. The special agent could find that some automobiles used by pickup men had been purchased with Sam's funds; the purchases of others could not be traced. The special agent also found that Sam had purchased some furniture in the name of a relative. He concluded that Sam dealt largely in cash, and that Sam's income could not be reconstructed by reference to bank deposits or to net worth increases. Cash expenditures which the special agent was able to trace to Sam were consistent with the amounts of net *82 income reported by Sam, but he was not satisfied that he had found all of Sam's cash expenditures. After constant surveillance and investigations of Sam and of his associates, the special agent, on July 2, 1958, filed with the U.S. Commissioner in Birmingham an affidavit for search warrant for the house on Rocky Ridge Road used by Sam for the lottery operation. In this affidavit the special agent stated that he believed that Sam and others were operating a lottery; that Sam had reported a "large amount" of income from wagering on his Federal income tax return for 1956; that neither Sam nor others named in the affidavit had filed an application for registry, had purchased a wagering occupational tax stamp, or had filed a wagering excise tax return for any month in the fiscal year ended June 30, 1958; and that operation of a lottery without having first registered and purchased a tax stamp and without filing wagering excise tax returns and paying the tax due constituted a fraud on the revenue. The special agent made similar allegations in an affidavit for a search warrant for Sam's person. The U.S. Commissioner issued the warrants, and between 12 p.m. and 1 p.m. on July 3, 1958, special *83 agents raided the house on Rocky Ridge Road where Sam's lotteries were being conducted. At the time of the raid, several pickup men had reported in; presumably, others had not. The special agents waited as long as feasible before raiding the house in order to seize as much evidence as possible of the day's activities. The raid caught Sam's employees by surprise as they were checking bet tickets. Bet tickets from several drawings were in the room where the employees were working. Two employees ran from the house, but the agents were able to seize bet tickets, winning slips, other lottery paraphernalia, $404.74 in coins, and $337 in currency. Apparently, some employees attempted to hide money on their person as the agents entered, and the agents seized about $500- $600 from the employees who attempted to flee. Sam was not at the house at the time of the raid, but shortly thereafter a special agent apprehended him and seized from him $362 in currency, three checks drawn by the same individual in the amounts of $1,000, $1,000, and $2,000, a check payable to cash in the amount of $80, and a small sheet which was a memorandum of fees, costs, and fines totaling $783.95 paid by Sam on *84 various dates between April 16 and May 2, 1958, on behalf of writers or pickup men who had been arrested. The bet slips seized in the raid represented five classes or drawings, numbered 4, 5, 6, 7, and 8. Class 4 represented the drawings of the afternoon of July 1, 1958; class 5, the drawings of the morning of July 2; class 6, the drawings of the afternoon of July 2; class 7, the drawings of the morning of July 3; and class 8, the drawings of the afternoon of July 3. When the agents raised the house, the employees were checking class 7 bet slips. The afternoon drawings had not been conducted, and relatively few bet slips for the afternoon drawings had been delivered to the house by the time of the raid. As a result of the raid, Sam was indicted on January 20, 1959, by a Federal grand jury on a six-count indictment charging him with violation of Federal wagering excise tax statutes and conspiracy to violate these statutes. On June 8, 1959, Sam entered a plea of guilty to the charges and was fined $1,000 and sentenced to a 3-month term in the custody of the Attorney General. The agents kept the seized bet slips and categorized them by station number and class. The slips were *85 inadvertently lost or destroyed prior to the hearing herein, but the agents' list of them was available. Bet slips seized in the raid showed the following: Class 4
Class 5
Class 6
Class 7
Class 8
Number of slips
1,781
1,844
1,826
1,767
40
Total wagers
$1,726.20
$1,862.65
$1,776.75
$1,742.85
$40.45
Grand total of wagers on classes 4, 5, 6, and 7 - $7,108.45
Respondent's determinations herein were based on Sam's gross receipts from wagering as indicated by the foregoing summary. Respondent determined that, since the total wagers from classes 4, 5, 6, and 7 represented Sam's gross receipts for 2 days' operations, the average daily gross receipts amounted to $3,554.22; that Sam operated for 6 days a week (each day of the week but Sunday), through 1956, 1957, and from January 1 through July 3, 1958, when the raid occurred; that he therefore operated 313 days in each of the years 1956 and 1957, and 158 days in 1958; and that gross receipts [13] for each taxable year could be computed by multiplying the number of operating days in each year by the average daily gross receipts calculated on the basis of the bet slips seized in the *86 raid. Thus, respondent determined that Sam realized gross receipts in the amount of $1,112,470.86 in each of the years 1956 and 1957 and in the amount of $559,840.57 [14] in the year 1958. Respondent determined that, of the total gross receipts of the lotteries, 25 percent was paid to writers and 5 percent was paid to station managers, and that one-half of the remaining 70 percent was paid out in allowable expenses and losses. Applying these percentages to the amounts of gross receipts as determined, respondent determined that Sam realized net income from lotteries in the taxable years 1956, 1957, and 1958 in the respective amount of $389,364.80, $389,364.80, and $195,944.20. Recognizing that the income from "wagering" reported by Sam in his income tax returns was from operation of the lotteries, *87 respondent determined that Sam had unreported taxable income from lotteries in the taxable years 1956, 1957, and 1958 in the respective amounts of $347,864.80, $369,564.80, and $174,944.20. The deficiencies in income tax here in controversy result from this determination. Ultimate Findings of Fact Sam engaged in the operation of lotteries from January 1, 1956, through January 9, 1957, and from October 1, 1957, through July 3, 1958. His lotteries were operated on an average of 4 days a week during these periods. He realized net income from the lotteries equal to 30 percent of the average daily gross receipts from his lottery operations (that is, the total amount wagered by bettors without reduction for amounts withheld by writers or station managers). For the period January 1, 1956, through December 31, 1957, the average daily gross receipts (as defined above) of Sm's lottery operations were approximately $3,000. He operated about 200 days in 1956. He operated about 5 days in January 1957 and about 52 days in October, November, and December 1957. For the period January 1 through July 3, 1958, the average daily gross receipts from Sam's lottery operations were approximately *88 $3,200. He operated about 104 days during 1958. A part of the deficiencies in income tax for each of the taxable years 1956, 1957, and 1958 was due to fraud with intent to evade tax. Opinion The first issue is whether Sam realized taxable income from his lottery operations during the taxable years 1956, 1957, and 1958 in excess of the amounts he reported from this source on his returns for those years; and, if so, the amounts thereof. Sam, who admittedly had an interest in illegal lottery operations during those years, reported on his returns for 1956, 1957, and 1958 income from "wagering" in the flat amounts of $41,500, $19,800, and $21,000, respectively. No explanation of how these figures were arrived at was given on the returns, and Sam apparently kept no records of his lottery income and expenses; or at least he failed to produce them, both during respondent's investigation and at the time of the trial. Finding that it was impossible to determine Sam's wagering income from his books and records, or by the net worth, bank deposits, or other more familiar methods of reconstructing net income, respondent determined that the total amount bet on the tickets seized in a raid *89 on Sam's lottery on July 3, 1958, reflected the average amount of Sam's gross receipts from the lottery over a 2-day period, which he then divided by 2 to arrive at average daily gross receipts ($3,554.22). Respondent deducted from the average daily gross receipts so computed the typical commissions paid to writers and station managers, totaling 30 percent of gross receipts, and determined that 50 percent of the net would be the average amounts paid out for "hits" and other expenses. This left 35 percent of the gross receipts which respondent determined was the average daily net taxable income Sam realized from the lottery operation. Respondent then determined that Sam operated the lottery 6 days a week throughout the years 1956 and 1957 and up to July 3, 1958. Multiplying the average daily net taxable income by the number of days of operation, respondent determined that Sam's net taxable income from the lottery operation was $389,364.80 for both 1956 and 1957 and was $195,944.20 for 1958. Respondent's determination is presumed to be correct, unless proven to be arbitrary and invalid. Petitioners rely primarily on the claim that respondent's determination was arbitrary, unreasonable, *90 and excessive, and thus invalid, that it is therefore to be accorded no presumption of correctness, and that we can give it no effect. They rely on , affirming (C.A. 2, 1934), which reversed and remanded a Memorandum Opinion of this Court; (C.A. 4, 1961), (C.A. 5, 1957), (C.A. 6, 1955), and (C.A. 6, 1955), all reversing and remanding Memorandum Opinions of this Court; and (C.A. 6, 1947), reversing and remanding . The rule to be derived from those authorities is that a petitioner, upon proving that respondent's determination is invalid and arbitrary - that is, that it has no rational foundation in fact and is based upon assumption which cannot be supported - has no burden of proving the correct amount of tax which he may owe, and that, upon such a showing it is incumbent upon this Court to determine the facts from the *91 available evidence of record without regard to the presumption of correctness generally attaching to respondent's determination. Without direction from a reviewing court, as occurred by the orders of remand in the cases cited, we have often applied the rule and have ascertained relevant facts from the entire record when it was apparent that respondent's determination was incorrect in some particular. See e.g., . However, the burden is upon petitioner to demonstrate in the first instance that the determination is arbitrary and unreasonable before it may be held it is not to be accorded the presumption of correctness. . We recognized in the Harbin case, involving, as does the instant case, a taxpayer who reported only a lump sum as income from wagering and who maintained no books and records, that respondent's authority to reconstruct income of a taxpayer is broad and is not limited to any one particular method, and that he may resort to the best procedure available under the circumstances in making his determinations. See also *92 (C.A. 5, 1961); (C.A. 4, 1950), affirming a Memorandum Opinion of this Court; . And we further recognized that, when the taxpayer maintains no books and records, respondent need not determine income with mathematical certainty in order that the determination be reasonable and not arbitrary, since the primary duty to establish correct income rests with the taxpayer and he cannot prove respondent's determination to be arbitrary by simply failing in his own duty to maintain such records as would establish correct tax liability. See also (C.A. 4, 1949), affirming per curiam a Memorandum Opinion of this Court. Much of what we said in the Harbin case is material here. Here, because of Sam's failure to keep records, and his custom of dealing only in cash and keeping no bank accounts or property in his own name, respondent's agents decided it would be impossible to determine Sam's income by any of the usual methods. They therefore reconstructed Sam's wagering income from what known facts were available to them. While we do not agree with *93 all of the assumptions used by respondent, we do not think his determinations were arbitrary, in the sense of being capricious; nor do we think the method of reconstruction used by respondent was unreasonable or invalid under the circumstances. Cf. (C.A. 5, 1957), certiorari denied, . Petitioners do not seriously contend that the method used by respondent was invalid, nor do they suggest any other method that might have more clearly reflected their income. Their principal contention is that the assumptions used by respondent in applying the method are arbitrary and unreasonable - thus the determination is invalid. Apparently the only evidence respondent had available to determine Sam's income from the lottery operation was that the lottery appeared to be operating almost every day - but never on Sunday - while respondent's agent had it under close surveillance from March 1958 until the raid on July 3, 1958, and that the bet tickets seized in the raid indicated that approximately $7,108 had been bet on the four "classes" or drawings revealed on the tickets. The agent's observations indicated that *94 there were two drawings a day, which observations were supported by the testimony of petitioners' witnesses, so the agent concluded that the seized tickets reflected the amounts bet on the lottery over a 2-day period. He therefore determined that one-half of the $7,108.45 was an average amount bet on the lottery for 1 day and that the lottery was operated 6 days a week. [15]
In support of their position, petitioners offered the testimony of the accountant who prepared petitioners' returns, who stated that he thought the returns were correct but admitted that the amounts of gambling income reported were simply figures given to him by Sam; and testimony *95 of two of Sam's employees who worked at Sam's counting house at times. Between them the latter testified that Sam's lottery was in operation from November 1, 1956, until it was raided on January 9, 1957, and from about October 1, 1957, until it was raided on July 3, 1958. They also testified that the lottery was operated from 3 to 6 days a week but sometimes closed down when police pressure was on, that the lottery was closed down for a period of 4 or 5 weeks in the spring of 1958, and that the average net profit on the lottery did not exceed 20 percent of the gross receipts. However, no basis was given for the estimate of net profit, and both witnesses admitted that they did not know whether Sam was operating a lottery at times they were not working for him. [16] Sam, who was present in the courtroom throughout the trial, did not testify, although it appears that he is probably the only person who could supply the information necessary to make a more exact determination of his income from the lottery operation. *96 But, while we would not feel entirely unjustified under the circumstances in sustaining respondent's determination of taxable income on the ground that petitioners have failed to carry their burden of proving either that the determination was arbitrary and invalid or wherein it was wrong, as we did in the Harbin case, we nevertheless believe there is sufficient evidence in this record to indicate that respondent's determination of net income from wagering was probably high, so we have done our best to redetermine petitioners' correct taxable income from the evidence presented without reliance on the presumption favoring respondent's determination. Of necessity we have followed the method of reconstruction used by respondent because no other method is suggested by or supported by the evidence of either party. Admittedly there are gaps in the evidence and our conclusions are at best approximations based on assumptions we have gleaned from the evidence we do have, and unfortunately do not rest entirely on proven facts as we would prefer, but it is our obligation to redetermine the correct amount of tax from what evidence is presented to us, and that we have done. Our only alternatives *97 would be to affirm respondent's determination on the presumption of correctness that attaches thereto, which we do not think would be just, cf. (C.A. 7, 1927), or to make a finding of no deficiency because of lack of sufficient evidence to make an exact determination. To do that would be "tantamount to holding that skilful concealment is an invincible barrier to proof," , and to reward the person who deliberately refuses to keep records as required by law. Cf. (C.A. 8, 1935); , aff. (C.A. 10, 1949). In his determination respondent assumed that the amounts bet on the tickets seized in the July 3 raid were representative of the average amounts bet each day the lottery was in operation. This assumption finds some support in the fact that the tickets seized by the sheriff in the raid on Sam's lottery on January 9, 1957, indicated that total wagers for the day were approximately $3,346.70. However, we deem it reasonable that daily receipts for days *98 immediately preceding a raid would be greater than the average. We heard rather extensive evidence from a special agent, Internal Revenue Service, bearing upon how the raid of July 3, 1958, was planned and executed. Prior to the raid, agents had had Sam and his pickup men and station managers under surveillance. These agents cooperated with the local police and the sheriff, and it seemed to be generally known that Sam would discontinue his operations for days when arrests of his personnel had been heavy. Therefore, we think it reasonable that when a raid was planned, in the hope that Sam would be operating on the day of the raid, law enforcement officers would cooperate in calling off arrests, temporarily, of Sam's writers, station managers, and pickup men in order to assure that Sam would be operating at the central location at the time of the raid. With arrests thus discontinued for a time, Sam's daily receipts would be increased until, for the day of the raid and for the days immediately preceding the raid, Sam would be taking in an above average amount of receipts. We have taken this factor into account in arriving at the average daily receipts recited in our findings. We also *99 believe several other factors would have affected the average daily receipts from Sam's lottery operations, which factors we have also taken into consideration. Petitioners' witnesses testified, and it seems reasonable to assume, that after a lottery had been closed down and was just resuming operations it would take some time to reestablish the operating organization and to regain the customers so that the average daily receipts at the beginning of operations would be less than after the lottery had been operating without interruption for awhile. Another factor was the number of arrests of writers or pickup men. If a writer or pickup man was arrested, the money carried by him would be seized, and the bets which his funds represented would be "shut out" for the day. Sam would have to give all the bettors who had thus been shut out free bets for the next day. Therefore, an arrest would have two effects: Daily receipts for the days when bets were shut out would be less, on the average, than receipts for days when there were no arrests, and "hits" for following days when Sam would have to give free bets would be a higher percentage of receipts than "hits" for days when no free bets had *100 to be given. For the above and other reasons we think the amount of bets reflected on the tickets seized in the raid of July 3, 1958, and also the raid of January 9, 1957, were somewhat above the average daily wagers. We also believe it is reasonable to assume that the amounts bet on the tickets seized in the sheriff's raid of January 9, 1957, are more indicative of the average daily wagers made during the years 1956 and 1957 than were the amounts bet on the tickets seized in the raid of July 3, 1958. The next factor to be considered is the number of days which Sam operated. Respondent determined that Sam operated 6 days out of every week throughout 1956, 1957, and until July 3, 1958. It is quite probable that Sam would have attempted to operate every day of the week except Sunday, but this was the ideal. The testimony of Sam's employees indicates that the ideal was not achieved consistently because of arrests and the threat of raids. When arrests were heavy and persistent, Sam closed down. His employees testified that Sam operated between 3 and 6 days each week. Using our best judgment, we have concluded that Sam was able to operate on an average of 4 days out of every 7-day period, *101 and our findings have been based on this conclusion. The next question is whether Sam was able to operate his lotteries throughout the period January 1, 1956, to July 3, 1958, as assumed by respondent. We have very little evidence with respect to Sam's operations during the year 1956. Sam's employee testified that he went to work for Sam in October or November of 1956 and that he worked for Sam until the sheriff's raid in January 1957 but he did not, and he probably could not, state that Sam was not engaged in operations of lotteries prior to the fall of 1956. On the other hand, it had been stipulated that Sam had an interest in the "King and Queen" lotteries and the "Boy and Girl" lotteries during the periods in question, yet no "Boy and Girl" bet slips were seized in either the sheriff's raid or the raid by the Internal Revenue Service. This is some indication that Sam was conducting the "Boy and Girl" lotteries before operation of the "King and Queen" lotteries began in October or November of 1956. We also have the testimony of police officers who were assigned to the lottery detail that it was generally understood that Sam was operating a lottery in 1956 prior to November. While *102 such evidence is not very reliable, we do believe from observing these witnesses on the witness stand that they would have been aware generally of which persons were operating the larger lotteries in the Birmingham area. Sam himself did not testify and he offered no evidence that he was not operating a lottery prior to November 1, 1956. We can only conclude that Sam was engaged in the business of operating lotteries throughout the year 1956 prior to the time he admittedly began operation of the "King and Queen" lotteries. But we cannot conclude that Sam was operating lotteries throughout 1957 after the sheriff's raid. Sam's employees testified that they did not work for him from January 9, 1957, until about October 1, 1957, when he leased the house to be used as a central location and apparently began operations. Sam was arrested on January 9, 1957; he was convicted on May 7, 1957, on a charge of possessing paraphernalia customarily used in a lottery, and he was sentenced to 1 year's imprisonment. The sentence was changed to probation on September 22, 1957, approximately 1 week before Sam leased the house to be employed in another lottery operation. We think it unreasonable to believe *103 that Sam would conduct a lottery operation in the Birmingham area after January 9, 1957, while his case was awaiting disposition. True, Sam's temerity in beginning operation some 9 days after he was placed on probation casts some doubt on this conclusion, but we are nevertheless constrained to believe that Sam did not operate a lottery from January 9 to October 1, 1957. This is supported to some extent by the testimony of the police officers who testified with respect to arrests of various lottery writers during the year 1957. The officers tied practically all of the persons arrested into the "Red and Blue" lotteries but we have no evidence that Sam operated the "Red and Blue" lotteries. Petitioners rely on the testimony of their witness Gustin, who testified that Sam's lotteries were closed down for a period of 4 or 5 weeks during the spring of 1958, to prove that Sam's lotteries were not operating continuously during 1958 prior to the raid. The revenue agent who conducted the raid testified that he had Sam's lottery operation under almost constant surveillance from early March until the raid in 1958 and that it was not closed down during that time. Gustin's testimony was vague *104 and we are more incline to believe the testimony of respondent's witness. Our conclusion that Sam operated on the average only 4 days during each of the weeks up to July in 1958 will compensate for any temporary closings that Sam may have made. We are concerned here with net income, of course. So far we have discussed only those factors bearing upon a reconstruction of gross income or gross receipts. It was stipulated that it was the established custom in the Birmingham area during the period here involved for writers to receive a commission of 25 percent of the gross wagers they turned in and that station managers were entitled to 5 percent of the gross wagers turned in by the writers. The testimony of petitioners' and respondent's witnesses support this assumption employed by respondent in determining petitioners' net income for 1956, 1957, and 1958. In addition to this 30 percent of gross receipts that must be taken into consideration, Sam had operating expenses. He employed 5 or 6 men at the central location to check bet slips, count money, and print winning tickets. Sometimes these men also acted as pickup men. Sam may have had pickup men in addition to these 5 or 6 employees. *105 Sam furnished his pickup men with relatively new automobiles, and he had to pay rent on the house used as a central location. The testimony of petitioners' witnesses would indicate that the salaries paid by Sam, exclusive of the commissions paid to the writers and station managers, would total about $90 per day. Of course, we have no records to support this testimony. However, the amounts involved would not seem unreasonable for an operation of this magnitude. Using our best judgment we have concluded that Sam incurred average operating expenses, over and above the commissions paid, of approximately $100 per day for each day that he operated. In addition, Sam of course incurred losses or "hits." Sam's employee testified that ordinarily a lottery operator would realize net income equal to about 20 percent of his gross receipts, but this figure was at no time supported or even explained. Perhaph the 20-percent figure takes into account nondeductible expenses such as fines for writers who had been arrested. On the other hand, a police officer experienced with lottery operations testified that in his opinion the lottery operator usually made a profit of 50 percent of the gross receipts *106 less commissions, and that he had on occasions checked the hit slips against bet tickets seized in arrests and determined that the hits equalled about 50 percent of the amounts "turned in" by the writers. In making his determinations of net income respondent allowed a deduction of 50 percent of the the gross receipts less both the writers' and station managers' commissions. The evidence indicates however that while the writer's commission of 25 percent was withheld, the station manager's commission of 5 percent was not deducted before the bets were turned in but was returned to him along with the reports of the drawings and hits. In our computation we have therefore compued the 50-percent allowance for "hits" on the gross receipts less writers' commissions only. This would allow a deduction for "hits" of about 37 1/2 percent of gross receipts. Taking all of the above factors into consideration we have concluded that after allowing a deduction from gross receipts of 25 percent for writers' commissions and 5 percent for station managers' commissions, 37 1/2 percent for "hits," and approximately 2 1/2 percent for other expenses, Sam's net profit from his lottery operations was approximately *107 30 percent of his gross receipts from those operations. In determining petitioners' net taxable income from "wagering" by the method outlined above under Rule 50, the 30-percent figure should be used rather than the 35 percent used by respondent. Petitioners argue that Sam had only a one-half interest in the "King and Queen" and the "Boy and Girl" lotteries - that he split the net profit from these lotteries equally with his partner, Louis Pike. This argument is based solely on the testimony of two of Sam's employees who said they understood there was a partnership but had no specific knowledge that there was. If there was such a partnership, there was no competent evidence of the fact. Neither Sam nor Pike was called to testify; there was no evidence of the partnership agreement, written or oral; and Sam's tax return did not show receipt of wagering income from a partnership with Pike. We cannot find from the evidence that Sam had a partner in his lottery operation. The final issue is whether petitioners are liable for the 50-percent addition to tax for fraud prescribed in section 6653(b) of the Code. Section 7454 of the Code places the burden of proving fraud on the respondent, *108 and it must be proven by clear and convincing evidence. (CA-5, 1957); ; . However, it is recognized that fraudulent intent can seldom be established by direct proof of the taxpayer's intent, and proof of fraud, if it is to be established, must depend to some extent on circumstantial evidence. It is usually found by surveying the taxpayer's whole course of conduct and is to be adduced as any other fact from all the evidence of record and inferences properly drawn therefrom. ; This is particularly true in a case like this where the taxpayer's activities were for the most part clandestine and his transactions were unrecorded. In proving fraud respondent does not have to prove the precise amount of the deficiency which is attributable to fraud, but only that a part of the deficiency is attributable thereto. (CA-7, 1948), certiorari denied ; *109 Our findings on the first issue indicate that Sam failed to report a large amount of his net income from the lotteries in each of the years 1956, 1957, and 1958. The consistent understatement of substantial amounts of income is persuasive evidence of a fraudulent intent to evade tax. ; , affd. (CA-6, 1958). In , the Court of Appeals for the Fifth Circuit, in discussing the effect of consistent understatements of income, said: Of course the courts have repeatedly held that the mere omission of reportable income is not of itself sufficient to warrant a finding of fraud in an income tax case. [Cits. omitted.] However, repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or missate taxable income presents a basis on which the Tax Court may properly infer fraud. See also (CA-5, 1954), affirming a Memorandum Opinion of this Court, certiorari denied . Here, Sam *110 was advised by his accountant that he should keep books and records on his lottery operations. So far as we know he kept no such records, and the evidence indicates he deliberately destroyed the wagering tickets after 2 or 3 days in order to conceal his activities and quite likely his income. He offered his accountant no proof or explanation of how he arrived at the figures that were reported on his returns as wagering income, and he has offered none at the trial. Sam dealt almost exclusively in cash and what property he acquired he placed in the name of someone else so that it would be most difficult for anyone to check his income or net worth in any way. We consider all of these efforts to conceal his activities and his income as evidence of a motive to operate outside the law, whether it be the local criminal laws or the Federal tax laws. . Sam failed to register and pay over the Federal excise tax on wagering as required by sections 4401 et seq. of the Code. While this is not direct evidence of an intent to evade income tax, it is evidence of a frame of mind with respect to payment of taxes generally, which we think should *111 be taken into consideration in determining Sam's intent with respect to payment of his correct income tax. And finally, although Sam could undoubtedly have filed many of the gaps in the evidence to permit a more exact determination of his correct taxable income and to explain why the income reported by him was considerably less than the income indicated by respondent's method of reconstruction, he failed to take the witness stand. We recognize a taxpayer's right to stand mute and force respondent to prove fraud, and we draw no affirmative inference of fraud from the fact that Sam failed to testify, but when the circumstantial evidence offered by respondent indicates a large understatement and the taxpayer fails to make any explanation thereof, we can only assume that his testimony would have been unfavorable to his cause. Cf. , affd. (C.A. 10, 1946); (CA-8, 1952), affirming a 'Memorandum Opinion of this Court ; The issue of fraud is a question of fact to be determined from the entire *112 record. Our careful analysis of all the evidence and the inference that can properly be drawn therefrom convinces us that at least a part of petitioners' underpayment of tax for each of the years 1956, 1957, and 1958 was due to fraud with intent to evade tax, and we have so found as an ultimate fact. The additions to tax provided in section 6653(b) of the Code are therefore to be applied. Decisions will be entered for the petitioner in Docket Nos. 84652 and 4219-62. Decisions will be entered under Rule 50 in Docket Nos. 84653 and 94991. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Sam and Katherine Fiorella, Docket Nos. 84653, 94991, and Shades Ridge Holding Company, Inc., Docket No. 4219-62.↩
2. Statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
1. Plus interest as provided by law.↩
3. Information regarding this building in reporting its sale is somewhat different from the information regarding the same building as shown on depreciation schedules attached to the return. Cost, for purposes of computing gain or loss, appears to have been overstated and confused with the cost of another building.↩
4. Apparently for the taxable period August 1 through December 31, 1958, although the return does not specifically indicate that it was for a short taxable period.↩
5. We quote from the accountant's testimony in answer to examination regarding advice given Sam about the necessity of maintaining "books and records."↩
1. There was debit to the account on January 25, 1956, in the amount of $25,000. ↩
2. There was debit to the account on January 10, 1957, in the amount of $10,000. ↩
3. There was debit to the account on February 20, 1957, in the amount of $11,744.41. ↩
4. There was debit to the account on April 23, 1958, in the amount of $4,990.77. ↩
5. The account was overdrawn prior to this deposit.↩
6. The example given is merely for purposes of illustration and to explain why the number of stations in operation cannot be calculated from the arbitrary numbers for stations indicated by "bet slips" adduced in evidence.↩
7. A 3-number series bet was called a "gig"; a 2-number series, a "flat" (although there was testimony to the effect that this term had another meaning); and a 4-number series, a "horse." The choice of 4 numbers, any 3 of which might win a 3-number series, was called a "2-way drop."↩
8. "Class" numbers did not always start from the first drawing in the week. There is testimony to the effect that an operator might arbitrarily choose a beginning point for the "class" order. But, in any event, the "classes" were numbered consecutively.↩
9. Sometimes the pickup men delivered the cash collections to the central location; other times, they met other pickup men at rendezvous points to escape detection.↩
10. In a proceeding brought by the solicitor on behalf of the State of Alabama to have the money forfeited to the State, it was alleged that the amount of $2,203.45 had been seized. The court ordered the amount of $1,533.36, less costs and less a percentage to be paid the arresting officer, be forfeited. Sam made no claim to the money; an employee unsuccessfully presented his claim. The court ordered the destruction of the seized slips.↩
11. He found some slips representing four bets on the "Queen" lottery for the afternoon drawing of the day preceding the raid. ↩
12. Some slips showed "5A" as the "class"; this had the same significance as "5."↩
13. Termed gross income in the statutory notices of deficiency. The terminology, for present purposes, is immaterial. ↩
14. Gross receipts for 1958 were determined by multiplying the number of operating days from January 1 through July 1, 1958, by average daily receipts, and by adding to the result, which totaled $554,458.32, the amount of receipts for July 2 and July 3, $5,382.25.↩
15. To have made any other determination on the basis of these facts alone would, perhaps, have been more vulnerable to a claim of arbitrariness than the determination respondent made. As a practical matter, however, we doubt that Sam could have operated 6 days every week of the period involved for reasons hereafter stated in the Opinion. We also think it is unlikely that Sam could have realized the large net income determined by respondent and hidden it so effectively that respondent's agents could find no trace of much of it.↩
16. If witness Gustin's estimate of 20 percent net profit and petitioners' claim that the lottery was not operated prior to November 1, 1956, are both accepted, it would have required gross wagers of considerably in excess of $3,500 per day for Sam to have realized the $41,000 net income from "wagering" which he reported on his 1956 return in that short period.↩